# United States Court of Federal Claims

No. 14-1028 C
(Filed Under Seal:  September 21, 2015)
(Reissued:  October 8, 2015)*

_____

**CROWLEY TECHNICAL
MANAGEMENT, INC.,**

              *Plaintiff*,

v.

**THE UNITED STATES,**

              *Defendant*,

and

**MAERSK LINE, LIMITED**,

              *Defendant-Intervenor.*

_____

Bid Protest; Motion for Judgment on the Administrative Record; Permanent Injunctive Relief; Public Interests in Military Operations; Fuel Cost Realism Analysis

    *James Y. Boland, Esq.,* Venable LLP, Baltimore, MD, for plaintiff.

    *Alexander O. Canizares, Esq.,* United States Department of Justice, Washington, DC, for defendant.

    *John H. Bennett, Esq.,* McKenna Long & Aldridge, Washington, DC, for defendant-intervenor.

## OPINION AND ORDER

**Block,** *Judge*.

    The United States Navy's Military Sealift Command ("MSC"), originally known as the Military Sea Transport Service, was established during World War II to be the "single managing agency for the Department of Defense's ocean transportation needs."[1]  Today, MSC serves this

---

* This opinion originally was issued under seal on September 21, 2015.  The court afforded the parties an opportunity to propose redactions in the opinion prior to its publication.  The court is mindful of the sensitive nature of this case and has redacted price terms and other proprietary information such as experience factor, sea margin, and fuel adjustment percentages.  The redacted opinion is herein reissued for publication, unsealed, with only minor alterations to account for redactions.

[1] This and other information about the MSC is available online at: http://www.msc.navy.mil/history.

country by executing its mission to "[o]perate the ships which sustain our warfighting forces and deliver specialized maritime services in support of national security objectives in peace and war." *Id.* As part of this mission, MSC conducts procurements on behalf of other military components in order to replenish our nation's naval forces. *Id.*

The case at bar concerns one such contract, awarded by MSC to Maersk Line Limited ("Maersk") for the enhancement and charter of a ship for use as a maritime support vessel. Plaintiff, Crowley Technical Management, Inc. ("Crowley") protests MSC's evaluation of fuel costs in connection with the procurement. Plaintiff avers that MSC conducted an "irrational and unlawful evaluation" of the offerors' projected fuel consumption costs and that consequently, its findings were arbitrary, capricious, an abuse of discretion, and contrary to law. Plaintiff alleges that but for MSC's unlawful evaluation, its offer would have been accepted by MSC.

Before the court are plaintiff's motions for permanent injunctive relief and judgment on the administrative record, filed pursuant to Rules 65 and 52.1(c) of the Rules of the Court of Federal Claims ("RCFC"), as well as defendant and defendant-intervenor's cross-motions for judgment on the administrative record, filed pursuant to RCFC 52.1(c). For the reasons stated below, the court will deny plaintiff's motion for permanent injunction and judgment on the administrative record and grant defendant and defendant-intervenor's cross-motions for judgment on the administrative record.

# I. BACKGROUND

### A. The Solicitation

On November 15, 2012, MSC issued a solicitation for the modification and charter of a Maritime Support Vessel ("MSV"), to be used by the United States Special Operations Command ("USSOCOM"). AR at 53. The solicitation instructed offerors to propose a "U.S. flagged, twin shaft vessel," which would then be substantially modified in order to enable the vessel to carry out the MSC's mission requirements. AR at 94. The listed mission requirements included the ability to "launch, recover, refuel, and resupply small crafts, provide force protection and perform stowing, and transport, launch/recover, and refuel both manned and unmanned rotary wing aircraft." *Id.* The retrofit vessel would have the capacity to host the ship's crew and between 50 and 209 military personnel. *Id.*

The solicitation provided a seven month ramp-up time, during which the contractor would implement the required enhancements. AR at 73, 90, 95. In addition to the ramp-up time, the solicitation's base period included a five-month charter. *Id.* At the conclusion of this base period, the solicitation's terms granted MSC four one-year options to extend the charter. *Id.*

Section M of the solicitation stated that the contract would be awarded to the lowest priced technically acceptable offeror, in accordance with Federal Acquisition Regulation ("FAR") 15.101-2. AR at 234-238. In other words, the evaluation factors other than price, namely technical and past performance, would be evaluated on an "acceptable/unacceptable basis." *Id.* at 234. For this reason, the solicitation provided that "the offeror with the lowest evaluated price proposal and acceptable past performance whose offer conforms fully to the solicitation requirements and meets the acceptability standards for all non-price factors" would receive the contract. *Id.*

The price factor for each bid comprised the costs for "program management support of ramp-up period, vessel modifications, charter hire and fuel for the firm and option time periods, redelivery bonus (if offered), and any other costs . . . set forth in the offer." AR at 236. Although innocuous in appearance, the fuel cost component has become the grand issue in this case.

The solicitation stated that fuel costs would be based on the "pre-modified" vessel's fuel consumption. AR at 237. To facilitate projecting these costs, the solicitation provided offerors with operational assumptions such as percentage of time underway, at loiter/anchor, or at port and weather conditions. AR tab 3a at 236; *see* AR 85 (Special Time Boxes 59-62); AR tab 3c at 394-96 (Attachment 12). Offerors projected the fuel consumption of their proposed vessels in these conditions to determine fuel cost. *Id.* But the solicitation provided that once the vessel was modified, fuel costs would be recalculated. AR tab 28 at 2765. As a result, the offerors' prices included stand-in fuel cost numbers, to be replaced post-award. *Id.*

MSC received thirteen proposals. AR at 1730-33. The agency deemed each of the offerors' technical and past performance factors to be acceptable. *Id.* Thus, MSC selected the offeror with the lowest total price. On November 12, 2013, MSC awarded the contract at issue to Maersk. AR at 1872-75. Maersk had proposed a cargo ship, the CRAGSIDE, and a total evaluated price of $163,777,124.60. AR at 1858. Crowley, in contrast, had proposed [**redacted**], and a total evaluated price of $[**redacted**]. Thus, the disparity between Maersk's successful bid and Crowley's unsuccessful bid was $[**redacted**]. Notably, this disparity can be explained by differences in fuel costs: Maersk had projected $20,628,066.59 in fuel costs, which was $[**redacted**] lower than Crowley's projected fuel costs of $[**redacted**]. As the court has alluded, MSC's treatment of these fuel costs is the subject of this bid protest.

**B. Proceedings at the Government Accountability Office**

Shortly thereafter, on November 22, 2013, Crowley filed a protest of MSC's award decision at the Government Accountability Office ("GAO"). AR at 1879-2339. In its protest, Crowley alleged that MSC had overlooked several flaws in Maersk's fuel calculations. *Id.* Crowley argued that these errors had resulted in Maersk understating its fuel costs and, therefore, undermined MSC's decision to award the contract to Maersk. *Id.*

On January 10, 2014, MSC acknowledged that corrective action was warranted. AR at 2754. Accordingly, on January 16, 2014, the GAO dismissed Crowley's protest on the grounds that MSC's corrective action rendered the protest academic. AR at 2755.

MSC's corrective action took the form of a cost realism analysis,[2] in which the agency reviewed the realism and methodology of the offerors' underlying fuel calculations. AR tabs 26 & 27. To conduct the analysis, MSC established a Fuel Consumption Evaluation Team ("FCET") made up of naval engineers and architects. AR at 3217, 3585. The team was chaired by Olivia Bradley, a supervisory contract specialist. *Id.* The FCET requested and received from each offeror narrative explanations of the methodologies used to calculate their fuel consumption rates and then proceeded to analyze that information. AR at 2768-3214, 3218.

---

[2] Cost realism is an analysis undertaken "to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal." FAR 15.404-1(d)(1).

Crowley submitted three fuel consumption projection methods as part of its explanation, methods A, B, and C. Method A, the method Crowley chose to employ in its actual bid, showed the power use during a "ready state" of Crowley's vessel in port with no passengers to be 500kW. AR at 2906. Method B showed that a sister ship of Crowley's vessel ran an average electrical load of 613kW during voyages, ranging between 500kW and 800kW. *Id.* Method C suggested that the electrical load for hotel services and accommodations would be approximately 250kW of power. Tab 33b at 3208. In contrast to Methods A and B, which were based on the data of actual ships, Method C was based on design information from the construction of Crowley's ship. *Id.* FCET considered Crowley's explanation of its fuel costs and did not alter the projected fuel cost that Crowley had used in reaching the offer price for its bid.

FCET also examined Maersk's responsive data and identified two "clerical errors" in Maersk's offer: an incorrect calculation involving an admiralty coefficient[3] and an errant fuel conversion from metric tons to barrels per day. AR at 3228, 3254. To correct these mistakes, MSC adjusted Maersk's most probable cost upward by $126,287.11 to a revised total cost of $163,903,411.71, which was still lower than Crowley's total evaluated price of $**[redacted]**. AR at 3256. Accordingly, MSC reaffirmed its decision to award the contract to Maersk as the lowest priced technically acceptable offeror.

Unsatisfied with MSC's adjustment of Maersk's price, Crowley filed another GAO protest on June 20, 2014. AR tab 38. Crowley's June protest challenged the FCET's cost realism findings, arguing the FCET failed to detect other fuel calculation errors. Crowley also argued that the method used by the agency to evaluate the fuel data had the effect of overstating Crowley's fuel costs or understating Maersk's. *Id.*

Crowley's argument that the FCET overlooked several additional fuel calculation errors centers on an email from the original engine manufacturer ("OEM") of Maersk's vessel. AR at tab 38. This email was submitted by Maersk in response to the FCET's informational request during its cost realism analysis. Tab 31a at 2802. The email demonstrated that Maersk's calculations incorrectly employed the "calorific" (that is caloric) values for marine diesel/gas oil when Maersk proposed to use a different fuel type, intermediate fuel oil 180. *Id.*; Tab 47 at 3510-11. Crowley contended that this "incorrect calorific value of fuel" resulted in understated costs. AR tab 47 at 3500-01. The FCET accepted this argument, agreeing that Maersk had failed to undertake the correct fuel conversion. AR at 3586. Accordingly, the agency adjusted Maersk's price upward by $1,158,092.58 to a total of $165,061,504.29, which was still lower than Crowley's $**[redacted]**. AR tab 154 at 3627.

Additionally, Crowley contended that Maersk had failed to adhere to a direction in the engine manufacturer's email instructing Maersk to increase its fuel consumption estimates by **[redacted]** percent[4] for tolerance and **[redacted]** percent for each engine-driven pump, to account for wear and tear. Tab 31a at 2802; Tab 47 at 3512. The dispute over whether Maersk accounted for this **[redacted]**% in fuel markups, referred to by the parties as the "tolerance adjustment," is one of the principle questions before the court. Pl.'s Mot. at 19-38.

---

[3] An admiralty coefficient is a constant for a given hull that gives the approximate relationships between propulsion power, ship speed, and displacement. The Basics of Ship Propulsion at 13. Available online at: http://marine.man.eu/docs/librariesprovider6/propeller-aftship/basic-principles-of-propulsion.pdf?sfvrsn=0.

[4] As mentioned, the tolerance adjustment, sea margin, and experience factor percentages have been redacted as proprietary information at the request of the parties.

- 4 -

MSC rejected the tolerance adjustment argument because the agency determined that Maersk had accounted for the cost of the **[redacted]**% increase with a separate **[redacted]**% markup the company had applied its total fuel cost estimate, known as the "experience factor." AR tab 49 at 3586; see AR tab 31a at 2791. Maersk stated that the experience factor was a **[redacted]**% hedge against general "business risk" that was applied to the total daily fuel consumption rate. Pl.'s Mot. at 23-25. The FCET considered Maersk's fuel calculation data, collected during the agency's fuel cost realism evaluation, and "concluded that this experience factor is sufficient to account for the OEM-considered recommended adjustments for tolerance and installed equipment; therefore, no adjustment is required." AR tab 49 at 3586; see AR tab 31a at 2791.

Crowley also contended that MSC failed to evaluate offerors' proposals on an "apples-to-apples" basis by failing to "normaliz[e]," or adjust, the bids to reflect equivalent passenger load assumptions. AR at 3297-98, 3502. Notably, Crowley's proposal made fuel assumptions based on a 285 person passenger load, whereas Maersk's bid assumed zero passengers. AR at 3297-98. Crowley pointed out that the solicitation "did not specify the number of passengers" and argued that, consequently, neither offeror's assumption was "incorrect" per se. AR at 3502. Nonetheless, according to Crowley, these differing assumptions precluded a meaningful comparison of the offeror's bids. AR at 3297-98.

Crowley claimed that its assumption of 285 passengers resulted in its ship's electrical load being overstated by 250 kilowatts and, consequently, its fuel cost estimates being overstated by $2,458,750. AR at 3297-98. This 250 kilowatt electrical load was figure was drawn from the aforementioned method C, included in Crowley's fuel cost realism response. Had MSC normalized the passenger assumptions by apply method C, Crowley's total price would have been $**[redacted]**, which is $**[redacted]** cheaper than Maersk's adjusted price[5] of $165,061,504.29.

But MSC rejected Crowley's "apples-to-apples" argument, disclaiming responsibility for the offerors' assumptions about operating conditions for the pre-modified vessels, which MSC said were "independently determined" by each offeror. AR tab 49 at 3588. In the alternative, MSC found that even if it were to adjust Crowley's fuel costs downward to account for the differing fuel passenger assumptions,[6] Maersk's offer would still be the lowest priced technically acceptable offer. In making this determination, MSC relied on a declaration by Ms. Bradley, the FCET chairperson, stating that Crowley's passenger assumption accounted for $1,103,469.14 in fuel costs, significantly less than Crowley's claimed number of $2,458,750. AR tab 153, at 3626. Ms. Bradley reached this figure by reducing the ship's power usage by 113 kilowatts, a number "derived from empirical data collected during actual ship and sister ship voyages." *Id.*

---

[5] As explained above, FCET found that Maersk had understated its fuel price by applying the wrong admiralty coefficient and the incorrect calorific value of fuel. FCET accordingly adjusted Maersk's total price upward from $163,777,124.60 to $165,061,504.29.

[6] It is worth noting that the offerors made differing assumptions on the impact of fuel consumption while at "loiter/anchor." AR tab 47 at 3492, 3502. The loiter/anchor condition was also not defined by the solicitation and Crowley acknowledged that "to be consistent and ensure a common basis for evaluation," MSC "should have adjusted Maersk's proposed fuel costs down by $386,960." AR at 3502. The FCET disagreed and did not adjust the parties' offers to normalize these assumptions. AR tab 49 at 3588.

After considering MSC's arguments, the GAO denied Crowley's protest on September 25, 2014. AR at tab 62. The GAO rejected Crowley's calorific value argument as untimely, finding it could have been raised during the solicitation. *Id.* The GAO was not persuaded by Crowley's tolerance argument, finding that the tolerance adjustments were accounted for in Maersk's **[redacted]**% experience factor. *Id.* Finally, GAO found that even if Crowley won its "apples-to-apples" passenger assumption argument, Crowley could not establish that it was prejudiced because, even after a downward adjustment of $1,103,469.14, Maersk would retain its status as the lowest-priced technically acceptable offeror. *Id.* at 3971-72.

### C. Proceedings Before This Court

Crowley filed its complaint and a motion for a preliminary injunction in this court on October 22, 2014. Dkt. No. 1. An initial status conference was held on October 27, 2014. Dct. No. 13. During that conference, briefing on the merits and on plaintiff's motion for injunctive relief were combined. Dkt. No. 13. On November 11, 2014, plaintiff filed its motion for judgment on the administrative record and motion for permanent injunction. Dkt. No. 23. On November 18, 2014, defendant filed its opposition and cross-motion for judgment on the administrative record. Dkt. No. 27. On that same day, defendant-intervenor filed its opposition and cross-motion for judgment on the administrative record. Dkt. No. 28. Oral argument was held on December 4, 2014.

## II. DISCUSSION

### A. Motions for Judgment on the Administrative Record

As explained above, plaintiff seeks both judgment on the administrative record and a permanent injunction. The court now addresses the former. A judgment on the administrative record is "properly understood as . . . an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (2005). In bid protest cases, such as the one at bar, a court must weigh the evidence in the record and determine whether the agency's procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Bannum, Inc.*, 404 F.3d at 1351. To make this determination, the court must decide if "the procurement official's decision lacked a rational basis." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (internal citations omitted). "To succeed . . . the protestor must show that the agency failed to provide a 'coherent and reasonable explanation of its exercise of discretion.'" *Wildflower Int'l, Ltd. v. United States*, 105 Fed. Cl. 362, 385 (2012) (quoting *Banknote of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004)).

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983). This court "does not sit as a super source selection authority to second guess agency procurement decisions. Rather, it is well established that the Court should not substitute its judgment to assess the relative merits of competing proposals in a Government procurement." *Ceres Envtl. Servs., Inc. v. United States*, 97 Fed. Cl. 277, 307-08 (2011) (citing *R & W Flammann GmbH v. United States,* 339 F.3d 1320, 1322 (Fed. Cir. 2003)). "Mere disagreement with an agency's handling of a procurement matter falls short of meeting the burden of proving that the process was arbitrary and capricious." *Blackwater Lodge & Training Ctr., Inc. v. United States,* 86 Fed. Cl. 488, 514 (2009).

Additionally, applying this standard in the context of an agency's cost realism analysis, an agency "need not [perform the analysis] with 'impeccable rigor' to be rational." *Westech Intern., Inc. v. United States*, 79 Fed. Cl. 272, 286 (2007) (quoting *OMV Med., Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000)). Rather, the cost realism analysis must "reflect that the agency considered the information available and did not make 'irrational assumptions or critical miscalculations.'" *Id*. "Unless the agency commits itself to a particular methodology in a solicitation . . . , the nature and extent of a price realism analysis, as well as an assessment of potential risk associated with a proposed price, are generally within the sound exercise of the agency's discretion." *Afghan Am. Army Servs.*, 90 Fed. Cl. 341, 357-58 (2009). When a method is not specified, the agency has "broad discretion" to conduct the cost realism analysis. *Ne. Military Sales, Inc. v. United States*, 100 Fed. Cl. 103, 118 (2011) (internal quotations omitted). Because MSC "is in the best position to make this cost realism determination, [the court's] review is limited to determining whether its cost evaluation was reasonably based and not arbitrary." *United Payors and United Providers Health Servs., Inc. v. United States*, 55 Fed. Cl. 323, 329 (2002) (internal quotation and citation omitted).

Finally, even if a plaintiff succeeds in establishing an error in the procurement process, a plaintiff cannot prevail in a bid protest unless it can demonstrate that it was "significantly prejudiced" by the agency's error. *Bannum,* 404 F.3d at 1353. To do so, a protestor must show that "there was a 'substantial chance' it would have received the contract award but for the errors." *Id.*; *see also*, *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed. Cir. 1996) (stating that a successful protestor "must establish not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award but for that error"). This requirement is of particular import given the instant facts.

In the case at bar, plaintiff contends that flaws in MSC's fuel cost realism analysis, the foundation for the agency's decision to uphold its award to Maersk, provide a sufficient basis to overturn the agency's award. Pl.'s Mot. at 19-38. Plaintiff's argument raises two questions for the court to address:

1. Was MSC's conclusion that Maersk's offer accounted for the **[redacted]**% tolerance adjustment irrational?

2. Was MSC's evaluation of the offeror's proposals without adjustment for differing assumptions irrational?

The court will address these two issues in turn.

*1. MSC Did Not Err in Determining That a Tolerance Adjustment Was Unnecessary*

Plaintiff argues that MSC erred in determining that a tolerance adjustment was unnecessary, for the following two reasons. First, plaintiff argues that Maersk had simply ignored the required tolerance adjustment, and that MSC "had no authority to compensate for Maersk's calculation errors by borrowing from Maersk's [experience factor]." *Id.* at 3. Second, plaintiff argues that MSC's determination that Maersk had accounted for the tolerance adjustment within its experience factor was irrational and "contrary to all evidence." *Id.* at 24. Pl.'s Mot. at 19-38. Plaintiff dismisses MSC's findings to the contrary as "post hoc calculation made during the heat of the GAO protest litigation." Pl.'s Mot. at 32.

To begin with, plaintiff argues that Maersk ignored the engine manufacturer's email instruction to apply the tolerance adjustment to its fuel consumption estimates. Pl.'s Mot. at 22.

- 7 -

Plaintiff contends that Maersk's failure to comply with the first section of the original engine manufacturer's email pertaining to calorific conversion rates, which MSC discovered and corrected during Crowley's GAO protests, indicates that Maersk "ignored" the email. *Id.* at 21. In plaintiff's view, this "creates a strong presumption" that Maersk did not apply the **[redacted]**% adjustment mandated in the second section of the email. *Id.* at 22.[7]

Plaintiff also argues that the order in which Maersk applied its calculations indicates that the experience factor was not intended to address the **[redacted]**% tolerance/engine-driven pump adjustment. Pl.'s Mot. at 24-25. Plaintiff points out that tolerance adjustments are ordinarily applied to the specific fuel oil consumption rate *before* reaching a total daily fuel consumption rate. *Id.* Maersk, in contrast, applied its **[redacted]**% experience factor to the total daily fuel consumption rate. *Id.* Nonetheless, plaintiff admits that "the arrangement of this calculation does not necessarily have mathematical significance." *Id.*

In addition to its arguments that Maersk failed to make the tolerance adjustment in the first place, plaintiff contends that MSC's decision to consider the experience factor in satisfaction of the tolerance adjustment is problematic in its own right. Specifically, plaintiff attempts to demonstrate that Maersk's **[redacted]**% experience markup cannot satisfy the **[redacted]**% tolerance adjustment because Maersk described the experience factor as a general "business risk," which was not intended to address "any specific type of loss." Pl.'s Mot. at 23. At oral argument, plaintiff stated that the **[redacted]**% experience factor was "there for a reason" and that business risk, not tolerance, was "what it was proposed for." Tr. at 65-66. In plaintiff's view, MSC's decision to "borrow" from the **[redacted]**% experience figure to rectify the tolerance adjustment issue with Maersk's bid resulted in a conclusion by MSC that was "tainted by fundamentally irrational and unsupported assumptions." *Id.* at 20, 24.

Furthermore, plaintiff argues that the **[redacted]**% experience factor cannot be applied to satisfy the **[redacted]**% tolerance adjustment because doing so would create deficiencies elsewhere in the offer. Pl.'s Mot. at 26-27. Specifically, plaintiff argues that borrowing from the **[redacted]**% experience factor would leave "unrealistically low" projections for sea margin.[8] Pl.'s Mot. at 27. Maersk's offer proposed a sea margin of **[redacted]**%. Tab 33a at 3173. Plaintiff cites a paper entitled "Basics of Ship Propulsion" for the proposition that an appropriate sea margin is 20-35%. Pl.'s Mot. at 26-27. Plaintiff contends that it "did not press this shortcoming during its GAO protest because Crowley considered Maersk's **[redacted]**% experience factor as sufficiently, though not fully, making up the difference because it would result in a total adjustment of **[redacted]**%, close to the 20-35% sea margin range." *Id.* Plaintiff argues that "borrowing" **[redacted]**% of the **[redacted]**% experience factor results in an unacceptably low sea margin of **[redacted]**%. *Id.*

The court disagrees with plaintiff's objections. In the first place, plaintiff's evidence that Maersk failed to adhere to a section of an email from its engine manufacturer regarding fuel conversations does not provide "strong" evidence that Maersk failed to follow instructions in a different section of the email which pertain to a different matter. Pl.'s Mot. at 27. As the GAO commented, Crowley "has not pointed to anything in Maersk's proposal that indicates that the **[redacted]**% experience factor *did not* include provision [for] tolerance." AR tab 62 at 3973

---

[7] At oral argument, plaintiff clarified that the term "presumption" was intended to mean an inference. Tr. at 76.

[8] "Sea margin is a factor that takes into account resistance associated with the weather conditions." Pl.'s Mot. at 26.

(emphasis added). "Naked claims, by all appearances unsupported by anything in the record, fall far short of meeting the heavy burden of demonstrating that ... findings were the product of an irrational process and hence arbitrary and capricious." *JWK Int'l Corp. v. United States,* 52 Fed. Cl. 650, 660 (2002). Each of these two arguments shares a common basis – speculation – and the court declines to breathe life into them by engaging in more of the same.

Similarly, the court is not persuaded by plaintiff's order of operations argument. Plaintiff acknowledges that "the arrangement of [Maersk's fuel] calculation does not necessarily have mathematical significance." *Id.* But, despite this concession, plaintiff asks the court to consider a potentially meaningless order of operations as sufficient evidence that Maersk's experience factor was not allotted for tolerance.

Second, it is important to note that even if the court accepted plaintiff's conjecture that Maersk overlooked the tolerance adjustment, plaintiff has not demonstrated how this oversight would provide a sufficient basis to overturn MSC's conclusion that the **[redacted]**% experience factor accounts for the **[redacted]**% tolerance adjustment. The closest plaintiff comes to doing so is its position at oral argument that the experience factor was "there for a reason" and that business risk was "what it was proposed for." Tr. at 65-66. Nowhere, outside of its sea margin argument, does plaintiff establish that MSC's decision to "borrow" from the **[redacted]**% experience factor represents an irrational determination sufficient to overturn the agency's cost realism analysis. Pl.'s Mot. at 20, 24.

Crowley's best attempt to show that MSC's finding on this question was irrational is its argument that such a conclusion creates inconsistencies in other portions of Maersk's bid. As discussed above, Crowley argues that **[redacted]**% sea margin is "unrealistically low," citing a paper for the proposition that 20-25% is an appropriate sea margin. Pl.'s Mot. at 27. Crowley contends that Maersk's **[redacted]**% experience factor must be allotted to Maersk's sea margin in order to bring it to acceptable levels. *Id.* But, Crowley's views aside, MSC's fuel cost realism analysis accepted Maersk's **[redacted]**% sea margin. AR at 3173; AR tab 34 at 3224. Crowley has not provided any evidence of "irrational assumptions or critical miscalculations" by the FCET sufficient to overturn this determination. *OMV Med.*, 219 F.3d at 1344.

Interestingly, even as plaintiff criticizes the agency for "borrowing" from Maersk's experience factor to account for the tolerance requirement, plaintiff concedes that it initially did not press plaintiff's alleged use of an "unrealistically low" sea margin because "Crowley considered Maersk's **[redacted]**% experience factor as sufficiently, though not fully, making up the difference." Pl.'s Mot. at 26-27. Plaintiff, in effect, appears to argue that "borrowing" from the experience factor to account for sea margin is rational, but that "borrowing" from the experience factor to account for the tolerance adjustment is irrational and arbitrary and capricious. Plaintiff makes no attempt to resolve this inconsistency.

As explained above, the role of the court is not to second guess the judgment of the agency but to determine whether the agency acted arbitrarily or capriciously. *Weeks Marine*, 575 F.3d at 1358. The court finds that the administrative record in this case does not demonstrate that MSC made "irrational assumptions or critical miscalculations" sufficient to undermine its determination that Maersk's offer accounted for the **[redacted]**% tolerance adjustment. *OMV Med,* 219 F.3d at 1344. Instead, the record supports defendant's view that MSC's conclusion was reached through a "rigorous, thorough and well-documented" process. Def.'s Resp. at 34 (citing AR tab 34 at 3222-32). The FCET, comprised of experts including naval engineers and architects, reviewed extensive data offerors submitted to the agency explaining their bids and employed their combined expertise to determine that no further tolerance adjustment was necessary. AR at 2754.

Plaintiff has not presented any evidence that the FCET failed to consider available information or any evidence of procedural errors in the FCET's process that would demonstrate the agency's finding in this case was irrational. In lieu of doing so, plaintiff attacks the FCET finding as a "post hoc calculation." Pl.'s Mot. at 32. But, this comment alone is not enough to overcome the "strong presumption that government contract officials exercise their duties in good faith." *Am-Pro Protective Agency, Inc.*, 281 F.3d at 1239; *See also, Rd. and Highway Builders, LLC v. United States*, 702 F.3d 1365, 1368 (Fed. Cir. 2012) (stating that this court has "long upheld the principle that government officials are presumed to discharge their duties in good faith.").

In sum, plaintiff has not established that MSC erred in finding that a tolerance adjustment was unnecessary. Plaintiff has not identified "irrational assumptions or critical miscalculations" in the agency's cost realism analysis. *OMV Med.*, 219 F.3d at 1344. Nor has plaintiff demonstrated that the agency's conclusion was irrational on the ground that it creates inconsistencies in other aspects of Maersk's bid. Accordingly, the court finds that plaintiff has failed to demonstrate that MSC lacked a "coherent and reasonable explanation" for its decision that a tolerance adjustment was unnecessary. *Banknote*, 365 F.3d at 1350.

*2. Crowley Cannot Demonstrate It Was Prejudiced by Passenger Assumptions*

Plaintiff argues that MSC's fuel cost realism analysis errantly failed to consider that offerors made differing assumptions about passenger loads, which affected the fuel cost projections in their bids. Pl.'s Mot. at 27-38. In light of MSC's statutory mandate to consider fuel costs, plaintiff contends that MSC was "required to equalize [for] . . . the presence of passengers" amongst the bids. According to plaintiff, MSC's "failure to do so was arbitrary, capricious, and contrary to law." *Id.* at 31 (citing 10 U.S.C. § 2305(a)(3)(A)(ii); FAR 15.304(c)(1)). In plaintiff's view, "comparing two dissimilar costs," here fuel costs for a ship with passengers and a ship without, does "not result in a rational or meaningful consideration of cost to the government." *Id.* at 28.

At the outset, the court notes that even if the agency's failure to account for differing passenger assumptions was in error, this failure is only material if plaintiff can establish that it was "significantly prejudiced" by this failure. *Bannum,* 404 F.3d at 1353. As the court explained above, plaintiff must be able to show that but for this error, there is a "substantial chance" that it would have been awarded the contract instead of Maersk. *Id.* The court has already upheld the agency's determination that no tolerance adjustment is necessary. Moreover, as explained above, the solicitation stated that offers would be evaluated on a lowest priced technically acceptable offer. Therefore, plaintiff cannot prevail unless it can show that but for the agency's failure to "normalize" the passenger assumptions of the bids, Crowley's offer price would have been lower than Maersk's offer.

During MSC's source selection, the agency determined that Maersk's total evaluated price of $163,777,124.60 was $**[redacted]** lower than Crowley's price. AR tab 35 at 3256. After correcting for the errors in Maersk's proposal[9] that MSC identified post source selection, Maersk's total most probable price is $165,061,504.29, which is still $**[redacted]** lower than Crowley's total probable price of $**[redacted]**.[10]

---

[9] MSC determined that these errors understated Maersk's costs by $126,287.11 and $1,158,092.58, respectively. AR at 3627.

[10] The court does not consider Crowley's alleged concession at GAO that Maersk's price should be lowered by an additional $386,960. The similarity between Maersk's "loiter/anchor"

The remaining price difference is notable because the FCET determined that, if an adjustment were made to account for the difference in passenger assumptions, it should be based on a reduction to the projected power consumption of 113 kilowatts, which would cut Crowley's projected fuel costs by only $1,103,469. AR at 3626-27. Although such an adjustment would narrow the price gap between Maersk and Crowley, Maersk would still retain its status as the lowest priced technically acceptable offeror by a margin of roughly $**[redacted]**.

Predictably, plaintiff takes issue with MSC's 113 kilowatt estimate of the impact of Crowley's passenger load assumption. Pl.'s Mot. at 32. As discussed, plaintiff dubs the FCET chairperson's declaration quantifying the passenger load impact a "post hoc calculation made during the heat of the GAO protest litigation." Pl.'s Mot. at 32. Plaintiff argues that "it was unreasonable for MSC to select 113 kW as the 'realistic' amount of power associated with passengers, because the conclusion was not rational, failed to consider the entirety of Crowley's clarifications, and was counter to the evidence before the agency." *Id.* Plaintiff attempts to demonstrate that the FCET's impact estimate was arbitrary in several ways.

First and foremost, plaintiff argues that MSC failed to consider all three of the methods for calculating passenger impact that Crowley submitted to the FCET during MSC's cost realism analysis. Pl.'s Mot. at 32. In plaintiff's view, MSC's decision to employ methods A and B to arrive at the 113kW figure for passenger impact was errant because it did not sufficiently consider the 250kW estimated passenger impact provided by method C. *Id.* Plaintiff argues that MSC's decision to consider certain methodologies over others resulted in a conclusion that was "arbitrary and incomplete." *Id.* at 33.

Furthermore, plaintiff argues that MSC's estimated impact "creates an irrational and unsustainable result." Pl.'s Mot. at 33. Plaintiff points out that method A projects an electrical load for hotel services at 290.1kW. *Id.* Plaintiff notes that if only 113kW of power is allocated to passengers, "the remaining load of 177.1kw would be attributable to [30] crew." *Id.* Plaintiff maintains that "MSC's conclusion was necessarily irrational because the agency's analysis would mean that significantly fewer cabins and personnel (crew) would consume more electricity than the 285 passengers, who number almost 10 times the number of crew, and whose cabins number more than three times the number of crew cabins." *Id.*

Additionally, plaintiff argues that MSC's electrical load impact estimation was flawed because it was based, in part, on an average electrical load figure of 613kW, derived from method B. Pl.'s Mot. at 34-37. In plaintiff's view, the 613kW average "does not provide the most accurate estimation of the total electrical load" because the average includes voyages with a lower number of passengers, which had an electrical load of roughly 500kW. *Id.* Plaintiff maintains that the inclusion of voyages with lighter passenger loads artificially depressed the average electrical load figure and undermines the reliability of methods A and B. *Id.*

Plaintiff also attempts to rebut defendant's argument that Crowley "relied on" method A to calculate the projected fuel costs for its original bid. Pl.'s Mot. at 36. Plaintiff comments that the purpose of the methods was "not to demonstrate a precise and realistic estimate of the total power/fuel cost associated with 285 passengers, but to demonstrate that Crowley's proposed total figure . . . was realistic." *Id.* Plaintiff contends that "[t]he FCET Chair's declaration provided no explanation or rationale why this fact had any relevance." *Id.*

---

assumptions and Crowley's passenger load is irrelevant because Crowley cannot demonstrate prejudice even without a reduction in Maersk's price. Def.'s Res. at 40-14.

As outlined, this court reviews MSC's cost realism analysis for "irrational assumptions or critical miscalculations." *OMV Med,* 219 F.3d at 1344. The court must determine whether MSC's decision on this question "lacked a rational basis" and whether Crowley can demonstrate that MSC failed to provide a "coherent and reasonable explanation of its exercise of discretion." *Weeks Marine*, 575 F.3d at 1358; *Banknote*, 365 F.3d at 1350.

The court turns once more to the declaration of FCET chairperson Bradley, in which she articulated two reasons for her decision to consider the 113kW figure derived from Crowley's methods A and B over the 250kW figure provided by method C. AR at 3626-27. Ms. Bradley stated that method C is less reliable because "MSC considers actual operational data" provided by methods A and B to be "more representative." AR at 3627. She also stated that MSC disfavored method C because it "was never used in the calculation of Crowley's proposed fuel consumption." *Id.* The court finds that MSC's preference for data gleaned from actual ship operations over more theoretical data provides a "rational basis" for the agency's decision. *Weeks Marine*, 575 F.3d at 1358. Ms. Bradley's declaration unequivocally stated a "coherent and reasonable explanation" for MSC's decision to favor certain methods A and B over method C. *Banknote*, 365 F.3d at 1350.

Likewise, the court is not persuaded by plaintiff's arguments attacking the fuel calculation methods the FCET considered, which Crowley itself supplied to the agency. As noted, the FCET was composed of technical experts assembled by the agency in order to assess cost realism as accurately as possible. AR at 3217, 3585. This court will abide by the admonition that it "is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. 29, 30 (1983).

The court also rejects plaintiff's characterization of Ms. Bradley's statement as a "post hoc calculation made during the heat of the GAO protest litigation." Pl.'s Mot. at 32. The court will not impute bad faith onto the FCET purely based on the context of prolonged protest litigation. As defendant notes, there is a "strong presumption that government contract officials exercise their duties in good faith." *Am-Pro Protective Agency, Inc.*, 281 F.3d at 1239. This strong presumption cannot be overcome by mere implication.

Plaintiff's inability to supplant the FCET's passenger load impact determination is ultimately fatal to its case. For the reasons explained above, the court will not disturb MSC's quantification of the impact of Crowley's passenger assumption nor will it upset the agency's determination that no tolerance adjustment is necessary. Therefore, plaintiff cannot demonstrate that it was significantly prejudiced because a downward adjustment of Crowley's price by $1,103,469 is not sufficient to trump Maersk's status as the lowest priced technically acceptable offeror. Moreover, as explained above, even if the court were to make such an adjustment, Crowley's total probable price would continue to exceed Maersk's by $**[redacted]**. Accordingly, the court rejects plaintiff's passenger assumption argument for failure to demonstrate prejudice, without reaching the question of whether MSC's decision not to make such an adjustment was in error.

**B. Plaintiff's Motion for Permanent Injunctive Relief**

In its motion, plaintiff petitions the court to "order MSC to suspend the contract awarded to Maersk, conduct a rational fuel cost realism analysis and make necessary adjustments as specified in this protest, and award the contract to Crowley as the LPTA offeror." Pl.'s Mot. at 39. Given the court's findings on the merits of this case, plaintiff's request for injunctive relief must be denied. *See PGBA, LLC v. United States,* 389 F.3d 1219, 1229 (Fed. Cir. 2004) (noting that a plaintiff "must" succeed on the merits before the court may grant a permanent

injunction); *Assessment and Training Solutions Consulting Corp. v. United States,* 92 Fed. Cl. 722, 737 (2010) (declining to grant a permanent injunction "because plaintiff has not succeeded on the merits of this case"). In any event, even if plaintiff were successful on the merits, the court would deny injunctive relief on the ground that any irreparable harm that plaintiff might suffer from the denial of injunctive relief is greatly outweighed by the national security concerns raised by defendant.

As a general matter, the court notes that an "injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter v. Nat'l Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008). This principle is equally applicable in the bid protest context. *See, e.g., PGBA, LLC v. United States*, 389 F.3d at 1228-1229 (holding that "section 1491(b)(4) . . . does not deprive a court of its equitable discretion in deciding whether injunctive relief is appropriate . . . and does not automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful contract award.").

In deciding whether permanent injunctive relief is appropriate, the court must consider whether "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc. v. United States,* 554 F.3d 1029, 1037 (Fed. Cir. 2009). No single factor is dispositive, and "the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial" of injunctive relief. *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed. Cir. 1993); *see Amoco Prod. Co. v. Vill. of Gambell, AK,* 480 U.S. 531, 546 n.12 (1987) (explaining that the "standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success").

This balancing method is rooted in "equity practice with a background of several hundred years of history." *Hecht Co. v. Bowles,* 321 U.S. 321, 329 (1944). Characterized by "[f]lexibility rather than rigidity," a balancing approach allows for "adjustment and reconciliation between the public interest and private needs." *Id.* In balancing these competing interests, the court must "weigh each harm or benefit based upon both its magnitude and likelihood of occurrence." *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 701 (2010). This balancing approach calls to mind Judge Learned Hand's familiar formula for determining negligence liability. *See United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2nd Cir. 1947).

In *Carroll Towing*, Judge Hand posited that a barge owner's duty to ensure their vessel remains properly moored "is a function of three variables: (1) The probability that [the barge] will break away; (2) the gravity of the resulting injury, if she does; (3) the burden of adequate precautions." *Id.* In algebraic terms, "if the probability be called P; the injury, L; and the burden, B; liability depends upon whether B is less than L multiplied by P: i.e., whether B less than PL." *Id.* Fundamentally, this calculation provides that the more grievous a potential injury or imminent in occurrence the harm, the lower a corresponding showing of probability or harm may be, thus the term sliding scale. "Consistent with equity's character, courts do not insist that litigants uniformly show a particular, predetermined quantum of probable success or injury before awarding equitable relief." *Winter,* 129 S.Ct. at 392. Rather, the court must balance all four factors, weighing each against the others. *Procter & Gamble Co. v. Kraft Foods Global, Inc.,* 549 F.3d 842, 847 (Fed. Cir. 2008); *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1350 (Fed. Cir. 2001).

Even when a plaintiff prevails on the merits, "a court must balance the potential harm to the plaintiff of not granting the injunction against the potential harm to both the Government and the awardee should the injunction be granted." *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 654 (2003). The courts are "particularly cautious when contemplating relief that implicates public interests." *Salazar v. Buono,* 130 S. Ct. 1803, 1816 (2010); *see Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312 (1982) (directing courts to "pay particular regard for the public consequences in employing the extraordinary remedy of injunction"); *Amoco Prod. Co.*, 480 U.S. 531 at 545 (noting the "important role of the 'public interest' in the exercise of equitable discretion"). Moreover, the Tucker Act specifically directs the court to "give due regard to the interests of national defense and national security" in bid protest cases. 28 U.S.C. § 1491(b)(3).

Admittedly, merely conclusory assertions of national security do not suffice to defeat motions for injunctive relief. *See, e.g., Gentex Corp.*, 58 Fed. Cl. at 655 (explaining that the court must not "blindly accede" to assertions of national security) (quoting *Harris Corp. v. United States*, 628 F. Supp. 813, 822 n. 13 (D.D.C. 1986)). Nonetheless, in evaluating assertions of national security, the court is extremely deferential and applies a sliding scale approach akin to the one used by Learned Hand in *Carroll Towing*—since national security concerns raise the possibility of serious harm, the court will require less evidence from the government to defeat a motion seeking injunctive relief. *See, e.g., Linc Gov't Servs*, 96 Fed. Cl. at 702-03 (noting that when interests raise national security concerns they "place the weight of both the public interest and balance of the hardships firmly on defendant's side of the scale."); *see also Gentex Corp.*, 58 Fed. Cl. at 656 (noting that military and security interests create an "inflated" importance on the public interest factor when balancing the equities); *Al Ghanim Combined Grp. Co. Gen. Trad. & Cont. W.L.L. v. United States*, 56 Fed. Cl. 502, 521 (2003) (the public interest in national defense and national security is of "inflated importance"); *Cincom Sys. Inc. v. United States*, 37 Fed. Cl. 266, 269 (1997) ("Given the importance of military preparedness to the national defense, the balance of harms tips in defendant's favor.").

As explained above, government officials are already entitled to "a strong presumption of regularity and good faith." *Linc Gov't Serv.*, 96 Fed. Cl. at 720; *see also Am–Pro Protective Agency, Inc.*, 281 F.3d at 1236, 1238–39 (stating that the court is "loath to find to the contrary [of good faith]") (citations omitted). But in addition to the deference that courts ordinarily accord to agencies in bid protests, an additional level of deference comes into play when the court considers an assertion of national security by a military or government official. *See, e.g., Winter,* 129 S. Ct. at 377 (underscoring the "great deference" that courts owe "to the professional judgment of military authorities concerning the relative importance of a particular military interest"); *North Dakota v. United States,* 495 U.S. 423, 443 (1990) ("When the Court is confronted with questions relating to . . . military operations, we properly defer to the judgment of those who must lead our Armed Forces in battle.").

Accordingly, the court accedes to the professional judgment of military officials unless the government's assertion is entirely without basis or "completely without foundation." *Gentex Corp.*, 58 Fed. Cl. at 655-56; *see also Avtel Servs., Inc. v. United States*, 70 Fed. Cl. 173, 230 (2006) (deferring to the government's declaration on the ground that "the Army's posture is not unreasonable"); *c.f. PGBA, LLC v. United States*, 57 Fed. Cl. 655, 661 (2003) (disregarding the government's declaration on the ground that it was "so implausible as not to be the product of rational decisionmaking"); *GTA Containers, Inc. v. United States*, 103 Fed. Cl. 471, 494 (2012) (discounting the agency's assertion of national security on the ground that the agency's decision to proceed with the contract was driven by a desire to satisfy its Small Business Act procurement goals rather than genuine national security concerns).

Defendant presents compelling evidence of a strong public interest in national security in the form of a declaration from Major General W. Lee Miller, Chief of Staff of the United States Special Operations Command ("USSOCOM"). Dkt. No. 27 Attach. A. The USSOCOM, one of nine Unified Combatant Commands, has a mission to "provide trained, equipped, ready, and regionally aligned special operations forces . . . and through unified action, conduct sustained special operations to eliminate threats to U.S. interests and protect the American people."[11] USSOCOM's operations range "from peacetime engagement and building partner capacity, to direct action raids and irregular warfare" and "have contributed significantly to not only our own National Security, but global stability at large." *Id.* The USSOCOM accomplishes its mission through "synchronizing the planning of global operations against terrorist networks." Dec. of General W. Lee Miller at ¶1.

Major General Miller has served with distinction in the United States Navy for thirty five years.[12] In recognition of that service to our country, General Miller has been honored with the Defense Superior Service Medal, Legion of Merit with Gold Star, Bronze Star with "V," Defense Meritorious Service Medal, Meritorious Service Medal with Gold Star, Navy Commendation Medal with Gold Star, and the Navy Achievement Medal. *Id.*

In his declaration, General Miller underscores the impact a permanent injunction would have on national security, stating that the vessel at issue is "urgently needed and has already experienced an unexpected lengthy delay due to protest actions, resulting in cumulative negative effects on the Government's ability to execute current mission requirements." Dec. of General W. Lee Miller ¶3. General Miller states that "[a]ny delay will have a significant and negative impact on National Defense by depriving USSOCOM of access to a vital asset necessary to perform classified missions." *Id.*

General Miller also notes that, although the mission requirement is currently being fulfilled by a third party vessel, that vessel's future availability is in question. Dec. of General W. Lee Miller ¶6. If the third party vessel is unavailable, it is possible General Miller's forces will have no access to a MSV, suffering "a complete gap in asset coverage." *Id.* General Miller states that such an outcome would "significantly impact . . . [his] force's ability to conduct their mission." *Id.* General Miller goes on to state that the current third party vessel "no longer supports the full range of special operations requirements." *Id.* at ¶4. According to General Miller, the enhanced vessel will "provide an exponential leap in capability to address current vessel shortfalls" and the vessel's improvements "are critical factors towards achieving mission success." *Id.*

The court notes that a degree of uncertainty is inevitable here, as some of the contingencies described by General Miller depend on the actions of third parties beyond the government's control. In this case, General Miller avers that the future availability of a third party vessel, which is currently providing essential support for USSOCOM operations, is uncertain. Nonetheless, the Leonard Hand formula described above provides a method of weighing the nature of the harm to the public. Even if the probability that the third party vessel will become unavailable in the interim is slight, the court finds that the gravity of the potential harm to the nation's Armed Forces that would be caused by the unavailability of a MSV is great, and outweighs any competitive harm that

---

[11] Admiral William McRaven, US Navy, Posture Statements to the House, Armed Services Committee, Hearing March 6, 2013, Available at:
http://www.socom.mil/Documents/2014%20USSOCOM%20POSTURE%20STATEMENT.PDF.

[12] A summary of Major General Miller's service can be found online at:
http://www.isaf.nato.int/about-isaf/leadership/major-general-walter-lee-miller-jr.html.

plaintiff will experience in the absence of an injunction. In any event, aside from the possibility that the third party vessel may no longer be available in the future, General Miller also states that delays due to protest actions are already negatively affecting "the Government's ability to execute current mission requirements," and that any further delay "will have a significant and negative impact." Dec. of General W. Lee Miller ¶3.

Plaintiff contends that General Miller's statements are "vague" or "conclusory." Tr. at 18. But, any lack of detail is somewhat expected given the classified nature of USSOCOM's operations. The court is unwilling to disregard General Miller's declaration because the sensitive nature of USSOCOM's operations prevent elaboration. In light of the gravity of the national security interest, the court requires less evidence from the government to defeat a motion seeking injunctive relief.

Finally, General Miller's evaluation of his forces' need for the vessel is an example of precisely the "complex, subtle, and professional decisions" that are "essentially professional military judgments." *Winter,* 129 S. Ct. at 377 (quoting *Gilligan v. Morgan,* 413 U.S. 1 (1973)). Plaintiff has not presented any evidence calling into question the good faith or expertise of General Miller. *See Avtel Servs., Inc.*, 70 Fed. Cl. at 230. The court finds that under the heightened standard of deference described above, General Miller's stated concerns are neither manifestly unreasonable nor "completely without foundation." *Gentex Corp.*, 58 Fed. Cl. at 655-56; *see Avtel Servs., Inc.*, 70 Fed. Cl. at 230. In light of the deference due to professional military judgments, the court is unwilling to second guess General Miller's assessment of the government's national security concern.

The court concluded above that plaintiff has not demonstrated success on the merits. Given the urgent need for the vessel and the gravity of the harm that would result from a complete gap of asset coverage, the court further concludes that the relative harm to the public interest and to the government from an injunction outweighs any harm to plaintiff.

### III. CONCLUSION

For the reasons set forth above, plaintiff's MOTIONS for permanent injunctive relief and judgment on the administrative record pursuant to RCFC 65 and 52(c), respectively, are DENIED. Defendant and defendant-intervenor's CROSS-MOTIONS for judgment on the administrative record, pursuant to RCFC 52(c) are GRANTED. The Clerk is hereby directed to take the necessary steps to dismiss this matter.

**IT IS SO ORDERED.**

s/ *Lawrence J. Block*
Lawrence J. Block
Judge